IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| VALLEY ELECTRICAL CONSOLIDATED, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>TFG-OHIO, L.P. and TETRA FINANCIAL GROUP, L.C.C.,<br><br>*Defendants*,<br><br>TFG-OHIO, L.P.,<br><br>*Defendant and Counterclaim Plaintiff*,<br><br>v.<br><br>VALLEY ELECTRICAL CONSOLIDATED, INC.; EVETS ELECTRIC, INC.; and J.L. ALLEN CO., LLC,<br><br>*Counterclaim Defendants*. | **MEMORANDUM DECISION AND ORDER GRANTING COUNTERCLAIM PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:16-cv-00751<br><br>District Judge Jill N. Parrish |

Before the court are TFG-Ohio, L.P.'s ("TFG") Motion for Partial Summary Judgment (ECF No. 44) and Valley Electrical Consolidated, Inc.'s ("VEC") Motion for Partial Summary Judgment (ECF No. 48). For the reasons set forth below, the court GRANTS TFG's Motion for Partial Summary Judgment and DENIES VEC's Motion for Partial Summary Judgment.

## I.     INTRODUCTION

This is a contract case. VEC, as the lessee, and TFG, as the lessor, entered into a Master Lease Agreement. The Master Lease provided for a Base Term of thirty-six months. It also

provided that the lease would extend for an additional twelve months unless VEC provided written notice of its intent to elect a different end-of-term option at least 180 days before the end of the Base Term. VEC failed to provide such notice. Consequently, TFG contends that VEC was required to make twelve additional monthly rent payments. VEC admits that it has not made any of the additional rent payments. But it argues that it was not required to do so for a variety of reasons. The court is unconvinced by VEC's arguments and therefore holds that VEC is liable for breach of contract because it has failed to make any of the twelve monthly rent payments.

## II. UNDISPUTED FACTS

### A. THE PARTIES

VEC is a construction solutions provider for oil and gas, industrial, and power generation markets. TFG is in the business of leasing equipment and other property to lessees in the form of finance leases. Generally, a finance lease is a "fixed-term lease used by a business to finance capital equipment." *Finance Lease*, Black's Law Dictionary (10th ed. 2014). "The lessor's service is usually limited to financing the asset, and the lessee pays maintenance costs and taxes and has the option of purchasing the asset at lease-end for a nominal price." *Id.*

### B. THE LEASE

On December 8, 2011, VEC, as the lessee, and TFG, as the lessor, executed the Master Lease Agreement. Master Lease ¶ 1, ECF No. 44-1. Pursuant to the Master Lease, TFG leased to VEC certain equipment and other property (the "Leased Property"). Master Lease ¶ 1. The Leased Property is described in the Amended and Restated Schedule No. 001 to the Master Lease (the "Lease Schedule"). Lease Schedule, ECF No. 44-5. The Lease Schedule and the Master Lease are collectively referred to as the "Lease." The purpose of the Lease was to fund the cost of improvements and equipment for a VEC facility located in Ohio. *See* Spencer Dep. 62:18-63:13.

The Lease Schedule provides that the Base Term of the Lease is thirty-six months. Lease Schedule ¶ 4. The Base Term began on March 6, 2012, and ended on March 31, 2015. *See* Master Lease ¶ 2; Lease Schedule ¶ 4. The Master Lease provides VEC with certain options upon the conclusion of the Base Term:

19.    [VEC'S] END OF TERM OPTIONS

Upon the completion of the Base Term of any Lease, provided at least one hundred eighty (180) days prior written notice is received by [TFG] from [VEC] via certified mail, [VEC] shall irrevocably elect one the of the following options: (i) purchase all, but not less than all, of the Leased Property for a price to be agreed upon by [TFG] and any applicable Assignee and [VEC]; (ii) extend the Lease for twelve (12) additional months at the rate specified on the respective Schedule, or (iii) return the Leased Property to [TFG] at [VEC's] expense to a destination within the continental United States specified by [TFG] and terminate the Schedule . . . . With respect to options (i) and (iii), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable. IN THE EVENT [TFG] AND [VEC] HAVE NOT AGREED TO EITHER OPTION (i) OR (iii) BY THE END OF THE BASE TERM, OR IF [VEC] FAILS TO GIVE WRITTEN NOTICE OF ITS ELECTION VIA CERTIFIED MAIL AT LEAST ONE HUNDRED EIGHTY (180) DAYS PRIOR TO THE TERMINATION OF THE BASE TERM, THEN OPTION (ii) SHALL AUTOMATICALLY APPLY AT THE END OF THE BASE TERM.

Master Lease ¶ 19.

In sum, VEC, so long as it provided 180-day prior written notice, could irrevocably elect either of the three end-of-term options: (i) purchase all the Leased Property; (ii) extend the Lease for twelve additional months; or (iii) return the Leased Property. *See* Master Lease ¶ 19. If, however, VEC failed to provide the requisite notice, then a twelve-month extension would automatically apply at the end of the Base Term. *See* Master Lease ¶ 19. The twelve-month extension would also automatically apply if the parties were unable to agree on option (i) or (iii) by the end of the Base Term. *See* Master Lease ¶ 19. With respect to option (i), purchase of the

Leased Property, both parties had "absolute and sole discretion" to accept or reject any terms of purchase. Master Lease ¶ 19.

The Master Lease defines an "Event of Default" to include, among other things, any failure "to make any payment of rent . . . which remains unremedied for five (5) days." Master Lease ¶ 16(a)(1). Paragraph 17(a) of the Master Lease provides:

> "Upon the occurrence of any Event of Default, [TFG] may, with or without the giving of notice, do any one or more of the following: . . . (10) With or without terminating the Lease, recover the Casualty Loss Value of the Leased Property as of the rental payment date immediately preceding the date of Default."

Master Lease ¶ 17(a).

The Casualty Loss Value of the Leased Property, as set forth in Exhibit B of the Master Lease, is $219,582.00 for any date that was thirty-six or more months from the Commencement Date of the Lease. Master Lease, Ex. B. Paragraph 17(c) of the Master Lease provides:

> [TFG] shall be entitled to recover all costs and expenses incurred by [TFG] in exercising any or all of the above-listed remedies, including without limitation . . . reasonable attorney fees and court costs incurred in connection therewith or in connection with any collection activities, negotiated settlement or otherwise resulting or arising from [VEC's] Default, and any indemnity, plus interest on all of the above until paid (before and after judgment, if any) at the lesser of the rate of twenty-four percent (24%) per annum or the highest rate permitted by law.

Master Lease ¶ 17(c).

The Master Lease also contains provisions regarding modification, waiver, integration, and choice of law. With respect to modification, the Master Lease "may not be contradicted by evidence of any alleged oral agreement and any change or modification must be in writing signed by the parties hereto." Master Lease ¶ 20(a) (emphasis removed). With respect to waiver, "[a]ny waiver by [TFG] of any right or remedy must be in writing specifically identifying what is being waived." Master Lease ¶ 17(b). With respect to integration, the Lease is "the entire agreement between the parties . . . and shall supersede all prior communications, representations,

agreements and understandings, in any form, and there is no understanding or agreement between the parties, oral or written, which is not set forth herein." Master Lease ¶ 20(a). With respect to choice of law, the Master Lease provides that it is to be "governed by and construed in accordance with the laws of the State of Utah." Master Lease ¶ 20(e) (emphasis removed).

## C. THE SECURITY AGREEMENT

In connection with the Lease, the parties executed a Security Agreement. Security Agreement ¶ 1, ECF No. 50-2. Pursuant to the Security Agreement, VEC granted to TFG a cash security deposit in the amount of $137,238.00, twenty-five percent of the amount funded under the Master Lease. *See* Lease Schedule ¶ 9; Security Agreement ¶ 3. Neither the Lease Schedule nor the Security Agreement set a date on which TFG was required to return the security deposit to VEC.

Between March 2013 and November 2014, Rick Razecca, a TFG National Account Executive, and Brenda Spencer, VEC's then Chief Financial Officer, communicated by email and over the telephone regarding the release of the security deposit. *See* ECF No. 51-1 at 10-26. On April 10, 2014, the parties executed a Partial Collateral Release (the "First Collateral Release"). First Collateral Release, ECF No. 46-1 at 15-16. Pursuant to the First Collateral Release, TFG released $45,769.30 to VEC. *See* First Collateral Release ¶ 1. By executing the First Collateral Release, VEC acknowledged and ratified that "the Security Agreement and the Lease shall remain in full force and effect without change." First Collateral Release ¶¶ 2-3.

On November 11, 2014, the parties executed another Partial Collateral Release Agreement (the "Second Collateral Release"). Second Collateral Release, ECF No. 46 at 20-21. Pursuant to the Second Collateral Release, TFG released to VEC the remainder of the security deposit, $91,469.30. *See* Second Collateral Release ¶ 1. With this second release, TFG released the entire security deposit, $137,238.00, before the end of the Base Term. Spencer Decl. ¶¶ 8, 10.

By executing the Second Collateral Release, VEC again acknowledged and ratified that "the Security Agreement and the Lease shall remain in full force and effect without change." Second Collateral Release ¶¶ 2-3.

### D. VEC FAILS TO PROVIDE TIMELY NOTICE

Because the Base Term of the Lease ended on March 31, 2015, VEC had to give written notice of its end-of-term election on or before October 2, 2014 to satisfy the written-notice requirement. *See* Master Lease ¶ 19. VEC did not give notice of its end-of-term election on or before October 2, 2014. Spencer Dep. 59:9-12.

On January 8, 2015, more than three months after the written-notice deadline, Mr. Razecca emailed Ms. Spencer. ECF No. 51-1 at 29. Mr. Razecca wrote, "I understand we have not received your notice [to elect an end-of-term option]; [my supervisor, Greg Emery,] asked me to send you information as to what we typically receive from clients." ECF No. 51-1 at 29. Mr. Razecca went on to write, "On your letter head [sic], simply state what is intended at the end of the term, 1. Purchase, 2. Extend or 3. Return." ECF No. 51-1 at 29. Ms. Spencer responded by email the next day. ECF No. 51-1 at 31. She attached to the email a letter in which she wrote that VEC "intends to exercise its option to (i) purchase all, but not less than all of the leased [property] for a price to be agreed upon by [TFG]." ECF No. 51-1 at 32.

During the next two weeks, Ms. Spencer and Mr. Razecca exchanged a number of emails. On January 13, Ms. Spencer asked whether TFG received a hardcopy of the letter and what the next steps were. ECF No. 51-1 at 35. On January 14, Mr. Razecca responded that VEC received the letter that morning. ECF No. 51-1 at 34. On January 19, Ms. Spencer asked whether there was "[a]ny further follow up." ECF No. 51-1 at 34. Two days later, on January 21, Mr. Razecca wrote that Mr. Emery was out of the office and that "[Mr. Emery] would be in touch . . . if he

needs anything else." ECF No. 51-1 at 34. This ended the exchange between Ms. Spencer and Mr. Razecca, and the parties did not communicate in writing for close to two months.

## E. PAYOFF NEGOTIATIONS

On March 20, 2015, Mr. Emery emailed Ms. Spencer. ECF No. 51-1 at 37. Mr. Emery wrote, "[a]s per our conversation, attached is the payoff letter and below is the breakdown." ECF No. 51-1 at 37. Upon receipt of the payoff, VEC's obligations under the Lease would be deemed satisfied and TFG would transfer its interest in the Leased Property to VEC. ECF No. 51-1 at 38. The total payoff was comprised of: (1) a residual payoff of $219,582.00; (2) six extension payments, totaling $92,817.18; and (3) taxes in the amount of $22,131.14. ECF No. 51-1 at 37. Thus, the total payoff amount was $334,530.32. ECF No. 51-1 at 38.

In internal emails, Ms. Spencer and other VEC employees discussed how to respond to the payoff letter. *See* ECF No. 47-6 at 2-3. In one email, Ms. Spencer wrote:

> If we went by the contract[,] the extension would be 12 months[.] . . . [TFG] is requesting a 6 month extension because we were late with the notice[.] . . . Feels if April rent not paid[,] [TFG] will enforce the contract[.] . . . Our payoff to them needs to have two components: Residual Value [and] Extension due to late notice[.]

ECF No. 47-6 at 2. In a subsequent internal email, Ms. Spencer wrote, "I want to confirm that we are not going to pay the April payment." ECF No. 47-6 at 3.

## F. VEC STOPS MAKING RENT PAYMENTS

VEC never accepted the terms of the payoff letter. *See* Greenwell Decl. ¶ 7. VEC has not made any monthly rental payments—or any payments at all on the Lease—since April 1, 2015. Greenwell Decl. ¶ 7. VEC continues to use the Leased Property, and it has made no effort to return or stop using the Leased Property. Ferry Dep. 7:9-8:2.

### G. PROCEDURAL BACKGROUND

On December 10, 2015, VEC filed a complaint against TFG. Compl., ECF No. 1-1. The complaint contains three causes of action. *First*, VEC alleges that TFG breached the Master Lease by "failing and refusing to agree upon a price for the Leased Property and for failing to sell the Leased Property to VEC for its fair value." Compl. ¶ 13. *Second*, VEC alleges that TFG breached the "implied covenant of good faith and fair dealing by failing and refusing to agree upon a price for the Leased Property." Compl. ¶ 17. *Third*, VEC seeks a declaration that that its only obligation under the Master Lease "is to pay the fair value of the Leased Property and the fair value of the Leased Property is its appraised value." Compl. ¶ 22. VEC has moved for partial summary judgment on its claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

In response to VEC's complaint, TFG brought multiple causes of action against VEC and other counterclaim defendants. Countercl. ¶¶ 49-118. TFG has moved for partial summary judgment on its First Cause of Action, breach of contract. Countercl. ¶¶ 49-53. Under the First Cause of Action, TFG alleges that VEC has "breached its obligations under the Lease by failing to make all payments due under the Lease." Countercl. ¶ 52. TFG alleges that it has suffered damages in excess of $246,382.89 as a result of the breach. Countercl. ¶ 53.

## III. ANALYSIS

### A. MOTION STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue

for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When the nonmoving party bears the burden of proof at trial on a dispositive issue, that party must "go beyond the pleadings" and "designate specific facts" so as to "make a showing sufficient to establish the existence of an essential element to that party's case." *Celotex*, 477 U.S. at 322. "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* As such, summary judgment is not a "disfavored procedural shortcut" but rather "an integral part of the Federal Rules as a whole" that is designed "to secure the just, speedy and inexpensive determination of every action." *Id.*

## B. TFG'S BREACH OF CONTRACT COUNTERCLAIM

The court first addresses TFG's motion for partial summary judgment, which seeks summary judgment on TFG's breach-of-contract counterclaim. "The elements of a *prima facie* case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).[1]

Here, it is undisputed that the parties formed a valid contract, the Lease. And it is undisputed that the Lease provides for liquidated damages in the event of breach. VEC does, however, contend that TFG has failed to establish the second and third elements, performance

---

[1] Here, the Master Lease provides that "the Master Lease, the lease documents, and the legal relationship between the parties shall in all respects be governed by and construed in accordance with the laws of the state of Utah." Master Lease ¶ 20(e). Consequently, Utah law governs all of the claims at issue because "questions involving the extent of contractual obligations are determined by the law chosen by the parties if they have made an effective choice." *Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188 (Utah 1996) (citation omitted).

and breach. Thus, the court first addresses whether TFG adequately performed under the Lease and then turns to the question of whether VEC breached the terms of the Lease.

## 1. Performance

It is undisputed that TFG provided the funding required by the Lease and that VEC still possesses the Leased Property. Despite this, VEC argues that TFG has not adequately performed under the Lease. Specifically, VEC contends that TFG materially breached the Lease when it (1) failed to negotiate a purchase price for the Leased Property in good faith and (2) did not return VEC's security deposit after VEC made twelve monthly payments.

### a. Whether TFG Materially Breached the Lease by Failing to Negotiate a Purchase Price in Good Faith

VEC argues that TFG materially breached the Lease by failing to negotiate a purchase price for the Leased Property in good faith. Specifically, VEC contends that TFG was required to negotiate in good faith as soon as VEC put TFG on notice that VEC intended to purchase the Leased Property. This argument fails for three reasons.

*First*, setting aside VEC's other affirmative defenses, TFG was not required to negotiate a purchase price for the Leased Property. As discussed above, VEC could elect to purchase the Leased Property *only if* it gave notice of its intent to do so 180 days before the end of the Base Term. Because VEC never provided such notice, the Lease automatically extended for an additional twelve months at the end of the Base Term. TFG had no obligation to negotiate a purchase price because VEC failed to give the required notice. Thus, it was impossible for TFG to breach the implied covenant by negotiating in bad faith because it was not obligated to negotiate a purchase price.

*Second*, even if TFG were required to negotiate a purchase price, both parties had "absolute and sole discretion to accept or reject any terms of purchase." In essence, VEC asks the

court to use the implied covenant of good faith and fair dealing to impose an obligation on TFG—to negotiate a reasonable purchase price—that is inconsistent with the plain language of the Master Lease. But the implied covenant cannot be used to "nullify a right granted by contract to one of the parties or to require a party vested with a contract right to exercise that right in a manner contrary to that party's legitimate self-interest." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991). Consequently, TFG had absolute and sole discretion to reject VEC's terms of purchase if doing so was consistent with TFG's legitimate self-interest.[2] Consequently, VEC's argument based on the implied covenant fails because it is inconsistent with the plain language of the Master Lease.

*Third*, even if TFG was required to negotiate a purchase price, there is no evidence that it negotiated in bad faith. Based on the language of the Master Lease, VEC must show that TFG exercised its "absolute and sole discretion" to "reject any terms of purchase" in bad faith. TFG offered to sell the Leased Property to VEC and to relieve VEC of its obligations under the Lease

---

[2] VEC also contends that it had a right to purchase the Leased Property for ten percent of the amount financed under the Lease. Like VEC's other arguments, this one too is contradicted by the plain language of the Master Lease and the record. VEC contends that, during negotiations, Mr. Razecca led Ms. Spencer to believe that the Leased Property could be purchased for ten percent of the amount financed under the Lease. But VEC does not have any evidence of this "agreement." VEC relies on Ms. Spencer's declaration, which provides, "*it was my understanding* that, at the end of the lease, the residual value of the property would be calculated at an amount not to exceed 10% of the total amount financed." Spencer Decl. ¶ 18 (emphasis added). But there is nothing in Ms. Spencer declaration indicating that VEC *and TFG* agreed that VEC could purchase the Leased Property for ten percent of the amount financed. Moreover, even if there were such an agreement, the Master Lease contains a merger clause, which provides that the Lease is "the entire agreement between the parties . . . and shall supersede all prior communications, representations, agreements and understandings, in any form, and there is no understanding or agreement between the parties, oral or written, which is not set forth herein." Master Lease ¶ 20(a). Thus, VEC cannot rely on any alleged oral agreement reached prior to the execution of the Master Lease. Finally, the Master Lease speaks directly to the issue of purchase price, providing that the price is "to be agreed upon" by the parties. Master Lease ¶ 19. If VEC wanted the right to purchase the Leased Property for ten percent of the amount financed, it should have included that term in the Master Lease.

for $334,530.32. After receiving this offer, Ms. Spencer wrote in an email, "I believe the negotiating starts now." ECF No. 47-5 at 2. Yet there is no evidence that Ms. Spencer (or anyone else at VEC) ever responded to TFG's offer. Instead, it appears that VEC decided to litigate rather than negotiate.

For the reasons set forth above, the court concludes that VEC has failed to show that TFG materially breached the implied covenant by failing to negotiate a purchase price in good faith. TFG was not required to negotiate a purchase price, and even if it were, it had absolute and sole discretion as to the purchase price it was willing to accept. Moreover, VEC has no evidence that TFG exercised this discretion in bad faith. Accordingly, the court concludes that VEC's performance was not excused based on TFG's alleged failure to negotiate a purchase price in good faith.

### b. Whether TFG Materially Breached the Lease by Failing to Release VEC's Security Deposit

VEC contends that TFG materially breached the Lease by failing to release VEC's security deposit after VEC made twelve monthly rent payments.[3] In support of this, VEC argues that, during the negotiation of the Master Lease, Mr. Razecca represented both orally and in writing that TFG would return VEC's security deposit in full after VEC made twelve monthly lease payments. Spencer Decl. ¶ 5.

A material breach includes "a failure of performance which 'defeats the very object of the contract' or '[is] of such prime importance that the contract would not have been made if default in that particular had been contemplated.'" *Polyglycoat Corp. v. Holcomb*, 591 P.2d 449, 451 (Utah 1979). "The law is well settled that a material breach by one party to a contract excuses

---

[3] At oral argument, counsel for VEC suggested that VEC was abandoning this argument. Nevertheless, the court addresses its merits.

further performance by the nonbreaching party." *Holbrook v. Master Protection Corp.*, 883 P.2d 295, 301 (Utah Ct. App. 1994) (quoted in *Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 199 (Utah 2004)).

The right to terminate for material breach can be waived if the party having the right elects not to and continues to receive the benefits of performance from the breaching party. 23 Williston on Contracts 63:9 (4th ed.); *see also In re Estate of Flake*, 71 P.3d 589, 599 (Utah 2003) (quoting *Soter's, Inc. v. Desert Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 937 (Utah 1993)) ("A waiver is the intentional relinquishment of a known right. To constitute a waiver, there must be an existing right, benefit, or advantage, a knowledge of its existence, and an intention to relinquish it. [The relinquishment] must be distinctly made, although it may be express or implied.").

Here, VEC's security-deposit argument fails for three reasons. *First*, TFG was not contractually obligated to return the security deposit after VEC made twelve monthly payments. The parties' final agreement does not provide for an early release of the security deposit. The Lease Schedule provides:

> Security Deposit: As additional security for the financing provided under this . . . Lease Schedule, [VEC] shall provide (or [TFG] shall hold back from any funding) a Security Deposit in the amount of $137,238.60, to be collected (or held back by [TFG] from any funding) prior to or in connection with any lease financing provided hereunder, and to be held in an instrument acceptable to [VEC].

Lease Schedule ¶ 9. If VEC wanted the security deposit released before the end of the Lease, it should have negotiated for that term in the Lease Schedule.[4] It did not. There is nothing in the

---

[4] VEC points to an email exchange between Mr. Razecca and Ms. Spencer to support its claim that TFG was required to release the security deposit after VEC made twelve monthly rent payments. *See* ECF No. 46-1 at 4-9. In the emails, Mr. Razecca represents that the security deposit would be returned after twelve monthly payments. *See* ECF No. 46-1 at 4-9. But this exchange occurred *before* the parties executed the Lease. And the Lease, which does not provide

Lease Schedule, or the Master Lease, that provides for the release of the security deposit before the end of the Lease. Accordingly, the court concludes that TFG did not breach the Lease when it failed to return the security deposit after VEC made twelve monthly rent payments.

*Second*, even assuming that TFG breached, VEC has failed to show that the breach was material because it has not identified any damages flowing from the alleged breach. VEC contends that TFG breached by failing to return the security deposit in a timely manner. But VEC does not identify any damages flowing from the alleged breach. TFG released the security deposit in 2014, before the end of the Base Term. There is no evidence whatsoever that the alleged breach "defeat[ed] the very object" of the Lease: VEC possessed the Leased Property for the entirety of the Base Term and it received the security deposit before the Base Term ended. Thus, even assuming that TFG breached, VEC has failed to show that the alleged breach was material because no reasonable fact finder, based on the record, could conclude that the breach "defeat[ed] the very object" of the Lease.

*Third*, even assuming that TFG materially breached, VEC cannot use this as a excuse for non-performance because, by continuing performance, it waived its right to terminate the Lease. TFG, according to VEC, materially breached the Lease in April 2013 by failing to return VEC's security deposit after VEC made twelve monthly rent payments. But instead of terminating the Lease then, VEC continued to perform for an additional twenty-four months. VEC accepted the benefits of the Lease, and it did not assert the alleged breach as grounds for recession until after this action commenced—years after the alleged breach. In fact, after TFG allegedly materially breached, VEC executed the First Collateral Release and the Second Collateral Release. In both

---

for an early release of the security deposit, is "the entire agreement between the parties . . . and shall supersede all prior communications, representations, agreements and understandings, in any form, and there is no understanding or agreement between the parties, oral or written, which is not set forth herein." Master Lease ¶ 20(a).

documents, VEC *acknowledged* and *ratified* that the Security Agreement and the Lease "shall remain in full force and effect without change." Consequently, the court concludes that, even if TFG materially breached, VEC waived its right to terminate the Lease because it later acknowledged and ratified that the Security Agreement and the Lease remained in full force and effect, and it continued to perform for an additional twenty-four months. *See Longenecker v. Brommer*, 368 P.2d 900, 903 (Wash. 1962) (right to terminate was waived by party that "continued to accept the benefit of [other party's] performance and did not assert the breach as a grounds for rescission of the contract until this action was instituted.").[5]

In sum, VEC has failed to show that TFG materially breached the Lease by failing to return the security deposit after VEC made twelve monthly payments. Even if it could, VEC waived its right to terminate the Lease because it continued to perform under the Lease for two years after the alleged breach. Consequently, the court concludes that VEC's performance was not excused by TFG's alleged failure to return the security deposit after twelve monthly payments.

### c. TFG Adequately Performed Under the Lease

For the reasons set forth above, the court concludes that TFG adequately performed under the Lease. TFG provided the funding required under the Lease and VEC still possesses the Leased Property. Moreover, VEC has failed to show that TFG materially breached the Lease by failing to negotiate a purchase price in good faith or by not returning the security deposit after VEC made twelve monthly payments.

---

[5] VEC's new-found defense is also inconsistent with its complaint. In its complaint, VEC asks for "a declaration that its only obligation under the Master Lease Agreement is to pay the fair value of the Leased Property." Compl. ¶ 22. Nowhere in the complaint, not even in the alternative, does VEC ask the court to declare that its performance was excused based on TFG's failure to return the security deposit.

## 2. Breach

TFG contends that VEC breached the Lease because it failed to make any of the twelve additional monthly rent payments. VEC admits that it has not made those payments. But it contends that it was not required to do so because TFG waived its right to extend the Lease for twelve additional months. VEC also argues that it was not required to make any of the additional rent payments because it elected to purchase the Leased Property, as opposed to extend the Lease.

### a. Whether TFG Waived Its Right to Enforce the Twelve-Month Extension

VEC contends that it was not required to make additional rent payments because TFG impliedly waived its right to enforce the twelve-month extension. In support of this, VEC points to an email from Mr. Razecca to Ms. Spencer. In the email, Mr. Razecca wrote, "I understand we have not received your notice [to elect an end-of-term option]; Greg [Emery] asked me to send you information as to what we typically receive from clients." Mr. Razecca also wrote, "On your letter head [sic], simply state what is intended at the end of the term, 1. Purchase, 2. Extend or 3. Return." For further support, VEC points to Ms. Spencer's declaration, which provides, "Rick Razecca represented to me that, although the notice was late, he did not believe this would be an issue." Spencer Decl. ¶ 13.

"The exercise of an option requires the affirmative performance of an option according to its specific terms." *Geisdorf v. Doughty*, 972 P.2d 67, 70 (Utah 1998). But "it is generally held that a lessor may waive strict compliance with option provisions." *Id.* at 71. "Waiver requires three elements: (1) an existing right, benefit, or advantage; (2) knowledge of its existence; and (3) an intention to relinquish the right." *Soter's*, 857 P.2d at 940. "[A]ny waiver must be distinctly made, although it may be express or implied." *Geisdorf*, 972 P.2d at 72 (quoting *Soter's*, 857 P.2d at 940).

Because a party must strictly comply with an option provision, "it logically follows that that a stricter standard is necessary for the waiver of option requirements than that which is required for waiver of bilateral contract provisions." *Id.* Accordingly, trial courts must be "especially careful in their examination of the evidence in questions of waiver and option performance." *Id.* Moreover, "courts should be cautious in finding implied waiver on the part of an optionor unless the totality of the circumstances demonstrates an unambiguous intent to waive the strict compliance required to exercise an option." *Id.* (footnote omitted).

Here, VEC has failed to show that a reasonable fact finder could conclude that TFG *unambiguously* indicated that it intended to waive strict compliance with the written-notice provision (and thus its right to enforce the twelve-month extension). Mr. Razecca informed Ms. Spencer that TFG had not received VEC's end-of-term election, and he provided an example of what VEC could send to provide notice. At best, the email suggests that TFG considered whether to waive strict compliance with the written-notice requirement. Perhaps TFG would have waived the requirement if VEC elected to return the Leased Property, as opposed to purchase it. Or perhaps VEC may have indicated that it intended to elect the twelve-month extension. In any event, the email does not evidence an unambiguous intent to waive the written-notice requirement (and thus the twelve-month extension).

VEC's reliance on Ms. Spencer's declaration further undermines its argument. VEC cites Ms. Spencer's declaration for the proposition that "Razecca represented to Spencer that *late notice would not be an issue*." ECF No. 46 at 17 (emphasis added). But this is not what the declaration says. It provides, "Rick Razecca represented to me that, although the notice was late, *he did not believe this would be an issue*." Spencer Decl. ¶ 13 (emphasis added). There is an important difference between Mr. Razecca saying that "late notice would not be an issue" and

him saying "he did not believe [late notice] would be an issue." The former indicates an unambiguous intent to waive the written-notice deadline—the latter does not. Thus, VEC, in misrepresenting its former CFO's declaration, highlights the fact that there was ambiguity as to whether late notice was an issue.

Whatever Mr. Razecca initially believed, by March 2015, TFG made clear to VEC that late notice was an issue. TFG proposed terms on which VEC could buy out the Lease. The terms included six extension payments, totaling $92,817.18. Notably, VEC did not protest that TFG had waived its right to enforce the twelve-month extension. Instead, Ms. Spencer and other VEC employees brainstormed alternative payoff amounts. Ms. Spencer even wrote, "Our payoff to them needs to have two components: Residual Value [and] *Extension due to late notice*." (emphasis added). VEC's reaction to the payoff letter shows that VEC did not believe that TFG had waived the written-notice requirement. In fact, Ms. Spencer appears to concede that TFG had the right to enforce the twelve-month extension.

Finally, the waiver argument is undermined by the plain language of the Master Lease. The Master Lease provides that "[a]ny waiver by [TFG] of any right or remedy must be in writing *specifically identifying what is being waived*." Master Lease ¶ 17(b) (emphasis added). Although a no-waiver clause is not dispositive on the issue of whether a party waived a right, it does constitute evidence that a party does not intend to waive its right to strict performance. *Living Scripture, Inc. v. Kudlik*, 890 P.2d 7, 10 (Utah 1995) (cited in *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 245 P.3d 184, 195-96 (Utah 2010)). Here, the no-waiver clause supports the conclusion that no reasonable fact finder could conclude that TFG intended to waive its right to enforce the twelve-month extension because the alleged waiver—Mr. Razecca's email—did not "specifically identify[] what [was] being waived."

In sum, the court concludes that VEC has failed to show that a reasonable fact finder could conclude that TFG waived its right to strict performance of the written-notice requirement (and thus its right to enforce the twelve-month extension). At best, the evidence shows that TFG *considered* waiving the written-notice requirement. Consequently, the court concludes that VEC's obligation to make additional rent payments was not excused based on TFG's alleged waiver.

### b. Whether VEC Breached the Terms of the Lease

VEC contends that TFG has failed to show that VEC breached the terms Lease. VEC argues that it was not obligated to pay rent for twelve additional months because it provided written notice of its intent to purchase the Leased Property. According to VEC, TFG could not extend the Lease for twelve months because VEC provided notice of its intent to purchase the Leased Property *before the end of the Base Term*. But this argument is inconsistent with the plain language of the Master Lease.

"If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002) (quoting *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 40 P.3d 599, 605 (Utah 2002)). Only when the language within the four corners of the contract is ambiguous can a court consider extrinsic evidence to determine the intent of the parties. *Id.* A contract term or provision is ambiguous if it is "capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Id.* (quoting *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 675 (Utah 2001)).

Here, setting aside VEC's affirmative defenses, TFG had every right to enforce the twelve-month extension at the end of the Base Term. The Master Lease provides, "Upon the

completion of the Base Term of any Lease, *provided at least one hundred eighty (180) days prior written notice is received by [TFG] from [VEC]* via certified mail, [VEC] shall irrevocably elect one of the following options . . . ." Master Lease ¶ 19 (emphasis added). Thus, VEC's right to elect an end-of-term option was *conditioned* on it giving notice of its election 180 days before the end of the Base Term. Nothing in the Master Lease allows VEC to elect an end-of-term option *after* the written-notice deadline. Therefore, any election after the written-notice deadline was ineffective.

The Master Lease unambiguously provides for what happens if VEC fails to elect an end-of-term option: "If [VEC] fails to give written notice of its election via certified mail at least one hundred eighty (180) days prior to the termination of the Base Term, then [a twelve-month extension] . . . automatically app[lies] at the end of the Base Term." Master Lease ¶ 19 (emphasis removed).[6] In short, the plain language of the Master Lease provides for an automatic twelve-month extension if VEC fails to give the required notice.[7]

_____

[6] VEC contends that the Master Lease is ambiguous because of "contradictory terms" concerning VEC's end-of-term responsibilities. The court disagrees. The Master Lease provides that the twelve-month extension would automatically apply if: (1) the parties did not agree to either option (i) or (iii) before the end of the Base Term; or (2) VEC failed to give written notice of its election via certified mail at least 180 days before the termination of the Base Term. Master Lease ¶ 19. VEC could have given the requisite notice, but the parties still could have failed to agree to option (i) or (iii) before the end of the Base Term. In that event, the twelve-month extension would still apply. To avoid the twelve-month extension, VEC needed to (1) provide notice of its intent to purchase the Leased Property at least 180 days prior to the termination of the Base Term and (2) reach an agreement with TFG concerning the purchase price. The Master Lease also gives TFG "absolute and sole discretion to accept or reject any terms of purchase." Master Lease ¶ 19. Thus, the Master Lease was drafted in a way that TFG could have rejected *any* offer made by VEC, thereby locking VEC into a twelve-month extension. *See* Master Lease ¶ 19. In essence, TFG had "absolute and sole discretion" to extend the Lease for an additional twelve months. VEC simply has a case of lessee's remorse—its understanding of how the Lease operated was, and is, wholly inconsistent with the actual terms of the Lease.

[7] Ms. Spencer testified that this was consistent with her understanding of the Master Lease. She was asked, "So did you understand at the time that this lease was entered into that if an election was not made by certified mail at least 180 days before the end of the base term, that it would

Because VEC failed to give the required notice,[8] TFG was entitled to enforce the twelve-month extension. VEC admits that it has not made any of the additional rent payments, which resulted in an Event of Default. *See* Master Lease ¶ 16(a)(1). Accordingly, the court concludes that VEC breached the Lease by failing to make any of the additional rent payments.

### 3. Damages

Under its breach-of-contract claim, TFG seeks damages in the amount of $219,582.00 plus pre-judgment and post-judgment interest as specified in the Master Lease.[9] VEC has challenged neither this amount nor the provision of the Master Lease that provide for it. The Master Lease provides that TFG may, upon the occurrence of any Event of Default, "[w]ith or without terminating the Lease, recover the Casualty Loss Value of the Leased Property." Master Lease ¶ 17(a). The Master Lease defines an "Event of Default" to include, among other things, any failure "to make any payment of rent . . . which remains unremedied for five (5) days." Master Lease ¶ 16(a)(1).

Here, an Event of Default occurred on April 6, 2015, when VEC's failure to make a monthly rental payment went unremedied for five days. Based on this, the Casualty Loss Value of the Leased Property is $219,582.00. *See* Master Lease, Ex. B. TFG is entitled to pre-judgment interest on this amount at a rate of twenty-four percent *per annum*. *See* Master Lease ¶ 17(c).[10]

---

automatically extend for another 12 months?" Spencer Dep. 45:1-5. She answered, "I'm sure if that's what I read, that's what I understood." Spencer Dep. 45:8-9.

[8] Ms. Spencer testified that she "knew [the notice] was late." Spencer Dep. 52:10-12.

[9] At oral argument, counsel for TFG represented that TFG was seeking this amount, plus attorneys' fees and costs. Counsel also represented that, upon receipt of this amount, TFG would relinquish to VEC all rights to the Leased Property, thereby resolving the entire dispute between the parties.

[10] Paragraph 17(c) provides for post-judgment interest "at the lesser of the rate of twenty-four percent (24%) per annum or the highest rate permitted by law." Utah Code Ann. § 15-1-1 provides that "parties to a lawful contract may agree upon any rate of interest for the loan or

Consequently, TFG is entitled to damages in the amount of $369,249.09.[11] TFG is also entitled to reasonable attorneys' fees and costs incurred in connection with this action. *See* Master Lease ¶ 17(c). TFG must seek any attorneys' fees and costs within fourteen days of the date of this order. *See* DUCivR 54-2.

### 4. TFG Is Entitled to Summary Judgment on its Breach of Contract Counterclaim

For the reasons set forth above, the court concludes that there is no genuine dispute of material fact and that TFG is entitled to judgment as a matter of law on its breach of contract counterclaim. TFG has shown that VEC breached the Lease by failing to make rent payments, and VEC's affirmative defenses do not apply. Accordingly, the court holds that that VEC is liable for breach of contract because it failed to make any of the twelve monthly rent payments. Judgment will be entered in favor of TFG and against VEC in the amount of $369,249.09.

### C. VEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

VEC has filed a motion for partial summary judgment on its claims for breach of contract and breach of the implied covenant. But VEC's motion actually appears to be an improper attempt to re-brief affirmative defenses, such as material breach, that were briefed in connection

---

forbearance of any money, goods, or chose in action that is the subject of their contract." Consequently, TFG is entitled to the twenty-four percent *per annum* interest rate provided in the Master Lease. The Master Lease does not specify whether the interest is simple or compound. Under Utah law, compound interest is awarded only when "the parties expressly agreed to compound interest." *Mountain States Broad. Co. v. Neale*, 783 P.2d 551, 555 (Utah Ct. App. 1989); *see also Watkins & Faber v. Whiteley*, 592 P.2d 613, 616 (Utah 1979) ("Compound interest is not favored by the law."). Consequently, the court concludes that the Master Lease provides for simple interest.

[11] Based on a twenty-four percent *per annum* interest rate, interest accrued on the $219,582.00 at a rate of $52,699.68 per year ($219,582.00 * .24 = $52,699.68). 2.84 years have passed between the Event of Default and the date of this order (and the separate judgment issued concurrently herewith). Consequently, interest accrued in the amount of $149,667.09 before the date of judgment ($52,699.68 * 2.84 years = $149,667.09). Post-judgment interest will accrue at the rate specified by federal law. *Youngs v. Am. Nutrition, Inc.*, 537 F.3d 1135, 1146 (10th Cir. 2008) ("The pre-judgment interest rate is set by state law, while the post-judgment rate is set by federal law."); *see also* 28 U.S.C. § 1961(a).

with TFG's motion for partial summary judgment. Indeed, VEC's claims on which it has supposedly moved for summary judgment do not actually seek the relief that VEC seems to request in its motion: a finding that it was not required to perform its obligations under the Master Lease because TFG materially breached. As such, VEC's motion actually appears to be an attempt to move for summary judgment on *TFG's breach-of-contract counterclaim* based on various affirmative defenses.[12] Regardless of the appropriate characterization, the court addresses the merits of the motion.

VEC's motion raises four issues. *First*, VEC contends that TFG materially breached the Lease by failing to release VEC's security deposit in a timely manner. *Second*, VEC contends that TFG materially breached the Lease by failing to sell the Leased Property to VEC at the end of the Base Term for a price not to exceed ten percent of the amount financed under the Lease. *Third*, VEC contends that TFG breached the implied covenant by affirmatively misrepresenting that it would only charge up to ten percent of the amount financed for the Leased Property. *Fourth*, VEC contends that TFG breached the implied covenant by misrepresenting that it would "work with" VEC on a purchase price for the Leased Property.

---

[12] This confusion is due mainly to the fact that VEC brought claims for breach of contract and breach of the implied covenant. Compl. ¶¶ 13-19. VEC did not, however, seek any relief based on a theory that TFG's alleged breaches were material, allowing VEC to terminate the Lease. *See* Compl. 13-22. Instead, VEC sought, among other things, "[a] Declaratory Judgment finding and judging that the only obligation of Plaintiff under the Master Lease Agreement is to pay the fair value of the Leased Property" and "[d]amages for breach of contract in an amount in excess of $25,000." Compl. at 4. As such, VEC's claim that it is moving for summary judgment on its claims of breach of contract and breach of the implied covenant is inconsistent with VEC's complaint. In short, VEC appears to have conflated the affirmative defense of material breach with its claims for breach of contract and breach of the implied covenant.

1. **Whether TFG Materially Breached the Lease by Failing to Release VEC's Security Deposit in a Timely Manner**

As discussed above, VEC has failed to show that TFG materially breached the Lease by failing to release VEC's security deposit after VEC made twelve monthly payments. *See supra* Part III.B.3. *First*, under the terms of the Lease, TFG was not obligated to release the security deposit after VEC made twelve monthly payments. *Second*, even if TFG breached, VEC has failed to show that the breach was material because it has failed to identify any damages flowing from the alleged breach. *Third*, even if TFG materially breached, VEC waived its right to terminate the Lease because it later acknowledged and ratified that the Security Agreement and the Lease remained in full force and effect, and it continued to perform under the Lease for another twenty-four months. Accordingly, VEC has failed to show that TFG materially breached the Lease by failing to return VEC's security deposit after VEC made twelve monthly payments.

2. *Whether TFG Materially Breached the Lease by Failing to Sell the Leased Property to VEC for Ten Percent of the Amount Financed*

As discussed above, VEC has failed to show that TFG materially breached the Lease by failing to sell the Leased Property to VEC for ten percent of the amount financed under the Lease. *See supra* Part III.B.2. *First*, TFG was not required to negotiate a purchase price because VEC failed to provide requisite notice of its intent to purchase the Leased Property. *Second*, even if TFG were required to negotiate a purchase price, the Lease did not provide for an agreed-upon purchase price and TFG (and VEC) had absolute and sole discretion to reject any proposed terms of purchase. *Third*, even if TFG were required to negotiate a purchase price, VEC has failed to show that TFG negotiated in bad faith. Accordingly, VEC has failed to show that TFG materially breached the Lease by failing to sell the Leased Property to VEC for ten percent of the amount financed under the Lease.

### 3. Whether TFG Breached the Implied Covenant of Good Faith and Fair Dealing by Misrepresenting that It Would Sell the Leased Property for Ten Percent of the Amount Financed Under the Lease

VEC contends that TFG breached the implied covenant of good faith and fair dealing by misrepresenting that it would sell the Leased Property for ten percent of the amount financed under the Lease. But, as noted above, the implied covenant cannot be used to "nullify a right granted by contract to one of the parties or to require a party vested with a contract right to exercise that right in a manner contrary to that party's legitimate self-interest." *Brehany*, 812 P.2d at 55. And the Master Lease provides that the price for the Leased Property is "to be agreed upon" and gives both parties "absolute and sole discretion to accept or reject any terms of purchase." Master Lease ¶ 19.

VEC does not actually point to any alleged misrepresentations made by TFG regarding the purchase price. The only evidence that VEC has concerning any such "representation" is Ms. Spencer's declaration in which she states, "Based on my communications with Rick Razecca, *it was my understanding* that, at the expiration of the lease term, VEC would be entitled to buy back the Leased Property for a residual value calculated at an amount not to exceed 10% of the total amount financed." Spencer Decl. ¶ 4 (emphasis added). VEC has no evidence that Mr. Razecca represented that VEC could purchase the Leased Property for ten percent of the amount financed; it only has evidence that its former CFO *believed* that VEC would be able to purchase the Leased Property for ten percent of the amount financed.[13]

_____

[13] VEC's argument regrading a ten-percent purchase price is further undermined by its inconsistent position on what the purchase price would be. VEC has suggested at least three different purchase prices for the Leased Property. *First*, in its complaint, VEC contends that it had the right to buy the Leased Property for its "fair value." *Second*, VEC attempted to amend its complaint to provide that TFG represented that VEC could purchase the Leased Property "for the sum of $1.00, or some other nominal amount." ECF No. 35 at 9; *see also* Ferry Dep. 14:2-4 ("[W]e would satisfy the terms of the lease and it would be a $1 buyback is how I remembered the presentation to me."). *Third*, VEC continues to contend that it could purchase the Leased

VEC also has failed to show that any of the alleged misrepresentations occurred when VEC was bound by the implied covenant. Specifically, VEC appears to base its claim on statements made *before* the parties executed the Master Lease. Indeed, Ms. Spencer declares that "VEC *agreed to* this financing based upon its ability to purchase the Leased Property at the end of the term for an amount not to exceed 10% of the amount financed." Spencer Decl. ¶ 4 (emphasis added). But it is well settled that "allegations of bad faith must relate exclusively to the failure to perform the obligations of the contract, not to misrepresentations occurring during the negotiations preceding the contract." *Potlatch Corp. v. Beloit Corp.*, 979 P.2d 114, 117 (Idaho 1999). Accordingly, VEC's breach of the implied covenant claim fails to the extent that it is based on negotiations or misrepresentations made prior to the execution of the Master Lease.

### 4. Whether TFG Breached the Implied Covenant by Representing That It Would "Work With" VEC on a Purchase Price

VEC contends that TFG breached the implied covenant by representing that it would "work with" VEC on a purchase price. But VEC has provided no evidence that TFG represented that it would "work with" VEC on a purchase price. In fact, VEC doesn't even address this argument in its briefing, instead focusing on the argument that TFG was required to sell the Leased Property for ten percent of the amount financed. Because VEC has no evidence that TFG represented that it would "work with" VEC on a purchase price, this claim fails as a matter of law.

### 5. VEC's Declaratory Judgment Cause of Action

VEC has not moved for summary judgment on its Third Cause of Action, which seeks a declaration that VEC's "only obligation under the Master Lease Agreement is to pay the fair

---

Property for ten percent of the amount financed under the Lease. VEC's inconsistent positions as to the purchase price further undermine its argument that there was some sort of agreement reached between Mr. Razecca and Ms. Spencer regarding the purchase price.

value of the Leased Property and the fair value of the Leased Property is its appraised value." But the court has determined that VEC breached the Lease by failing to make any of the twelve additional monthly rent payments. Consequently, an Event of Default has occurred and TFG is entitled to recover from VEC the Casualty Loss Value of the Leased Property, plus attorneys' fees and costs. Because VEC is required to pay to TFG the Casualty Loss Value, the court cannot declare that VEC's only obligation under the Master Lease Agreement is to pay the fair value of the Leased Property. Accordingly, the court concludes that VEC's Third Cause of Action fails as a matter of law.

## IV. CONCLUSION AND ORDER

For the reasons set forth above, the court GRANTS TFG's Motion for Partial Summary Judgment (ECF No. 44) and DENIES VEC's Motion for Partial Summary Judgment (ECF No. 48). The court holds that VEC is liable for breach of contract based on its failure to make any of the twelve additional monthly rent payments. Judgment shall be entered against VEC and in favor of TFG in the amount of $369,249.09. TFG must seek any attorneys' fees and costs within fourteen days of the date of this order. *See* DUCivR 54-2. The court further holds that VEC's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment fail as a matter of law.

Signed February 8, 2018

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge